# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 02-235V
(To be published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
KELLIE MILLER and                         \*
RON MILLER, as mother and father of       \*
A.H.M., a minor,                          \*              Filed: June 3, 2016
                                          \*
        Petitioners,               \*
                                          \*              Vaccine Act Fees and Costs;
        v.                         \*              Autism Case; Reasonable Basis
                                          \*
SECRETARY OF HEALTH AND                   \*
HUMAN SERVICES                            \*
                                          \*
        Respondent.                \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Michael L. Cave, Cave Law Firm, Baton Rouge, LA, for Petitioners.*
*Linda Renzi, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING ATTORNEYS' FEES AND COSTS

**HASTINGS,** *Special Master*.

    In this case under the National Vaccine Injury Compensation Program (hereinafter "the Program"[1]), Petitioners seek, pursuant to 42 U.S.C. § 300aa-15(e)(1), an award for attorneys' fees and other costs incurred in attempting to obtain Program compensation. They seek a total award of $63,669. After careful consideration, I have decided to grant the request in part, but to deny most of the request, because it was not reasonable for Petitioners to take to trial their very weak case contending that A.H.M.'s autism spectrum disorder was vaccine-related.

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2012 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2012 ed.). The statutory provisions defining the Program are also sometimes referred to as the "Vaccine Act."

1

# I

# BACKGROUND LAW CONCERNING ATTORNEYS' FEES AND COSTS AWARDS

*A. General*

Special masters have the authority to award "reasonable" attorneys' fees and litigation costs in Vaccine Act cases. §300aa–15(e)(1).  This is true even when a petitioner is unsuccessful on the merits of the case -- in such cases, a special master "may" award fees, if the petition was filed in good faith and with a reasonable basis.  *Id*. "The determination of the amount of reasonable attorneys' fees is within the special master's discretion." *Saxton v. HHS,* 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS,* 609 F.3d 1372, 1377 (Fed. Cir. 2010).

Further, as to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS,* 86 Fed. Cl. 201, 215 (2009); *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983); *Rupert v. HHS,* 52 Fed. Cl. 684, 686 (2002); *Wilcox v. HHS,* No. 90–991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997).  The petitioner's burden of proof to demonstrate "reasonableness" applies equally to *costs* as well as attorneys' fees.  *Perreira v. HHS,* 27 Fed. Cl. 29, 34 (1992), *aff'd,* 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure.  *Riggins v. HHS,* No. 99–382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd,* 406 Fed. App'x. 479 (Fed. Cir. 2011); *Sabella v. HHS,* No. 02–1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part,* 86 Fed. Cl. 201 (2009).  In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

> [i]n the private sector, 'billing judgment' is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley*, 461 U.S. at 433–34).  Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

The Federal Circuit has also made clear that special masters may rely on their prior experience in making reasonable fee determinations, without conducting a line-by-line analysis of the fee bill, and are not required to rely on specific objections raised by respondent.  *See Saxton*, 3 F.3d at 1521; *Sabella*, 86 Fed. Cl. 201, 209 (2009); *see also Wasson v. HHS*, 24 Cl. Ct. 482, 484, 486 (1991), *aff'd*, 988 F.2d 131 (Fed. Cir. 1993) (holding that, in determining a reasonable number of hours expended in any given case, a special master may rely on her experience with the Vaccine Act and its attorneys, without basing his decision on a line-by-line

examination of the fee application). A unanimous Supreme Court has articulated a similar holding:

> We emphasize, as we have before, that the determination of fees "should not result in a second major litigation." The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award." But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of "the district court's superior understanding of the litigation." We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Fox v. Vice*, 563 U.S. 826, 838 (2011) (internal citations omitted).

### B. *Reasonable basis*

The statute and legislative history afford no guidance as to the precise meaning of "reasonable basis," and the case law is relatively scant. The Chief Judge of this Court has explained that not all claims should be found to have a reasonable basis, and that whether a reasonable basis exists is determined by the "totality of the circumstances." *Chuisano v. HHS*, 116 Fed. Cl. 276, 285-286 (2014). A special master has "discretion" in determining whether a reasonable basis existed. *Murphy v. HHS*, 30 Fed. Cl. 60, 61 (1993), *aff'd without opinion*, 48 F.3d 1236 (1995) (judge affirmed a denial of reasonable basis, noting that the determination concerning reasonable basis is reviewed under an "abuse of discretion" standard). In other cases in which, as in *Murphy*, a judge affirmed a denial of reasonable basis, the court remarked that the special master's discretion is "wide" (*Perreira v. HHS*, 27 Fed. Cl. 29, 34 (1992)), and "very broad" (*Silva v. HHS*, 108 Fed. Cl. 401, 405 (2012)). In fact, in *Silva*, the court remarked that it is "difficult to imagine a broader grant of authority and discretion." 108 Fed. Cl. at 405.

The only opinion of the United States Court of Appeals for the Federal Circuit, discussing the "reasonable basis" requirement in a Vaccine Act case, is *Perreira v. HHS*, 33 F.3d 1375 (Fed. Cir. 1994). In *Perreira*, the special master concluded that the petitioners had a reasonable basis for *initially filing* the case and for the first part of their prosecution of the case, but concluded that there was *no reasonable basis* for pursuing the case beyond the point when the Perreiras submitted an expert report, at which time the Perreiras' attorneys should have realized that their expert's theory was plainly deficient to demonstrate causation. 33 F.3d at 1376. The special master denied fees and costs for work performed after that point, in taking the case to an evidentiary hearing. *Id*. Both the Court of Federal Claims (27 Fed. Cl. 29 (1992)), and the Federal Circuit (33 F.3d at 1376-77) affirmed.

The Court of Federal Claims judge rejected the Perreiras' argument that they automatically passed the "reasonable basis" test because they were relying on an expert's report, finding that argument to be "unreasonable." 27 Fed. Cl. at 33-34. The judge found that under all the circumstances of the case, for the petitioners to take the case to an evidentiary hearing "with

3

no support in the contemporaneous medical records," and with no "*reputable* medical opinion or scientific studies" (emphasis added) was also "unreasonable." *Id*. at 34.

The Federal Circuit agreed with the court below, observing that "counsel's duty to zealously represent their client does not relieve them of their duty to the court to avoid frivolous litigation." 33 F.3d at 1377. The appellate court added that Congress did not intend that every claimant qualify for an attorneys' fee award "by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury." *Id*. The court concluded that the special master did not err in determining that the Perreiras "no longer had a reasonable basis for claiming causation in-fact" after their expert report was filed. *Id*.

## II

### BACKGROUND: THE OMNIBUS AUTISM PROCEEDING ("OAP")

This case is one of more than 5,400 cases filed under the Program in which petitioners alleged that conditions known as "autism" or "autism spectrum disorders" ("ASD")[2] were caused by one or more vaccinations. A special proceeding known as the Omnibus Autism Proceeding ("OAP") was developed to manage these cases within the Office of Special Masters ("OSM"). A detailed history of the controversy regarding vaccines and autism, along with a history of the development of the OAP, was set forth in the six entitlement decisions issued as "test cases" for two theories of causation litigated in the OAP (see cases cited below), and will only be summarized here.

A group called the Petitioners' Steering Committee ("PSC") was formed in 2002 by the many attorneys who represented Vaccine Act petitioners who raised autism-related claims. About 180 attorneys participated in the PSC. Their responsibility was to develop any available evidence indicating that vaccines could contribute to causing autism, and eventually present that evidence in a series of "test cases," exploring the issue of whether vaccines could cause autism, and, if so, in what circumstances. Ultimately, the PSC selected groups of attorneys to present evidence in two different sets of "test cases" during many weeks of trial in 2007 and 2008. In

---

[2] "Autism Spectrum Disorder" is a *general* classification which as of 2010 included five different specific disorders: Autistic Disorder, Childhood Disintegrative Disorder, Asperger's Syndrome, Rett Syndrome, and Pervasive Developmental Disorder Not Otherwise Specified (PDD-NOS). *King v. HHS*, No. 03-584V, 2009 WL 892296 at *5 (Fed. Cl. Spec. Mstr. Feb. 12, 2010). The term "autism" is often utilized to encompass *all* of the types of disorders falling within the autism spectrum. (*Id*.) I recognize that since the OAP test cases, the consensus description of ASDs, contained now in the "DSM-V" as opposed to the prior "DSM-IV," revises the prior subcategories of ASD set forth in the first sentence of this footnote. However, the DSM-V retains the same *general description* of ASDs. An ASD is a serious form of neurodevelopmental disorder defined by a collection of symptoms and behaviors, including significant impairment of social interaction and language skills, and the presence of repetitive, stereotyped interests. *E.g.*, *Snyder v. HHS*, No. 01-162V, 2009 WL 332044, at *31 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).

4

the six test cases, the PSC presented two separate theories concerning the causation of ASDs. The first theory alleged that the *measles* portion of the measles, mumps, rubella ("MMR") vaccine could cause ASDs. That theory was presented in three separate Program test cases during several weeks of trial in 2007. The second theory alleged that the mercury contained in *thimerosal-containing vaccines* could directly affect an infant's brain, thereby substantially contributing to the causation of ASD. That theory was presented in three additional test cases during several weeks of trial in 2008.

Decisions in each of the three test cases pertaining to the PSC's *first* theory rejected the petitioners' causation theories. *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009) *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd* 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).[3] Decisions in each of the three "test cases" pertaining to the PSC's *second* theory also rejected the petitioners' causation theories, and the petitioners in each of those three cases chose not to appeal. *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

The "test case" decisions were comprehensive, analyzing in detail all of the evidence presented on both sides. The three test case decisions concerning the PSC's *first* theory (concerning the MMR vaccine) totaled more than 600 pages of detailed analysis, and were solidly affirmed in many more pages of analysis in three different rulings by three different judges of the United States Court of Federal Claims, and in two rulings by two separate panels of the United States Court of Appeals for the Federal Circuit. The three special master decisions concerning the PSC's *second* theory (concerning vaccinations containing the preservative "thimerosal") were similarly comprehensive.

All told, the 11 lengthy written rulings by the special masters, the judges of the U.S. Court of Federal Claims, and the panels of the U.S. Court of Appeals for the Federal Circuit *unanimously rejected* the petitioners' claims, finding no persuasive evidence that either the MMR vaccine or thimerosal-containing vaccines could contribute in any way to the causation of autism.

Thus, the proceedings in the six "test cases" concluded in 2010. Thereafter, the Petitioners in this case, and the petitioners in other cases within the OAP, were instructed to decide how to proceed with their own claims. The vast majority of those autism petitioners elected either to withdraw their claims, or to request that the special master file a decision denying their claim on the written record, resulting in a decision rejecting the petitioner's claim for lack of support. However, a small minority of the autism petitioners have elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses. A number of such cases have gone to trial before a special master, and in the cases of this type decided thus far, all have resulted in *rejection* of petitioners' claims that vaccines played a role in causing their child's autism. *See*, *e.g.*, *Henderson v. HHS*, No. 09-616V, 2012 WL 5194060 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2012) (autism not caused by pneumococcal vaccination); *Franklin*

---

[3] The petitioners in *Snyder* did not appeal the decision of the U.S. Court of Federal Claims.

*v. HHS*, No. 99-855V, 2013 WL 3755954 (Fed. Cl. Spec. Mstr. Hastings May 16, 2013) (MMR and other vaccines found not to contribute to autism); *Coombs v. HHS*, No. 08-818V, 2014 WL 1677584 (Fed. Cl. Spec. Mstr. Hastings Apr. 8, 2014) (autism not caused by MMR or Varivax vaccines); *Long v. HHS*, No. 08-792V, 2015 WL 1011740 (Fed. Cl. Spec. Mstr. Hastings Feb. 19, 2015) (autism not caused by influenza vaccine); *Brook v. HHS*, No. 04-405V, 2015 WL 3799646 (Fed. Cl. Spec. Mstr. Hastings May 14, 2015) (autism not caused by MMR or Varivax vaccines); *Holt v. HHS*, No. 05-136V, 2015 WL 4381588 (Fed. Cl. Spec. Mstr. Vowell June 24, 2015) (autism not caused by hepatitis B vaccine); *Lehner v. HHS*, No. 08-554V, 2015 WL 5443461 (Fed. Cl. Spec. Mstr. Vowell July 22, 2015) (autism not caused by influenza vaccine); *Miller v. HHS*, No. 02-235V, 2015 WL 5456093 (Fed. Cl. Spec. Mstr. Vowell August 18, 2015) (ASD not caused by combination of vaccines); *Allen v HHS*, No. 02-1237V, 2015 WL 6160215 (Fed. Cl. Spec. Mstr. Vowell Sept. 26, 2015) (autism not caused by MMR vaccination); *R.K. v. HHS*, No. 03-632V (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2015) (autism not caused by influenza vaccine) (not yet published), *aff'd* 2016 WL 552481 (Fed. Cl. J. Braden Feb. 12, 2016); *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603 (Fed. Cl. Spec. Mstr. Hastings Nov. 3, 2015) (autism not caused by several vaccines); *Sturdivant v. HHS*, No. 07-788V, 2016 WL 552529 (Fed. Cl. Spec. Mstr. Hastings Jan. 21, 2016) (autism not caused by Hib and Prevnar vaccines); *Vernacchio v. HHS,* No. 08-504 (Fed. Cl. Spec. Mstr. Corcoran Feb. 19, 2016) (autism not caused by influenza vaccine) (not yet published); *Murphy v. HHS*, No. 05-1063V (Fed. Cl. Spec. Mstr. Corcoran April 25, 2016) (autism not caused by DTaP or MMR vaccines) (not yet published).

In addition, some autism causation claims have been rejected *without trial*, at times over the petitioner's objection, in light of the failure of the petitioner to file plausible proof of vaccine-causation. *See, e.g., Waddell v. HHS*, No. 10-316V, 2012 WL 4829291 (Fed. Cl. Spec. Mstr. Campbell-Smith Sept. 19, 2012) (autism not caused by MMR vaccination); *Fester v. HHS*, No. 10-243V, 2016 WL 1745436 (Fed. Cl. Spec. Mstr. Dorsey April 7, 2016) (autism not caused by measles, mumps, rubella, and varicella (MMRV) vaccine); *Fresco v. HHS*, No. 06-469V, 2013 WL 364723 (Fed. Cl. Spec. Mstr. Vowell Jan. 7, 2013) (autism not caused by multiple vaccines); *Fesanco v. HHS*, No. 02-1770, 2010 WL 4955721 (Fed. Cl. Spec. Mstr. Hastings Nov. 9, 2010) (autism not caused by multiple vaccines); *Miller v. HHS*, No. 06-753V, 2012 WL 12507077 (Fed. Cl. Spec. Mstr. Hastings Sept. 25, 2012) (autism not caused by DTaP or MMR vaccines); *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. Vowell May 21, 2014) (autism not caused by MMR vaccination); *Pietrucha v. HHS*, No. 00-269V, 2014 WL 4538058 (Fed. Cl. Spec. Mstr. Hastings Aug. 22, 2014) (autism not caused by multiple vaccines); *Bushnell v. HHS*, No. 02-1648, 2015 WL 4099824 (Fed. Cl. Spec. Mstr. Hastings June 12, 2015) (autism not caused by multiple vaccines); *Bokmuller v. HHS*, No. 08-573, 2015 WL 4467162 (Fed. Cl. Spec. Mstr. Hastings June 26, 2015) (autism not caused by multiple vaccines); *Canuto v. HHS*, No. 04-1128, 2015 WL 9854939 (Fed. Cl. Spec. Mstr. Hastings Dec. 18, 2015) (autism not caused by DTP and DTaP vaccines); *Valle v. HHS*, No. 02-220V, 2016 WL 2604782 (Fed. Cl. Spec. Mstr. Hastings April 13, 2016) (autism not caused by DTaP vaccine). Judges of this court have affirmed the practice of dismissal without trial in such cases. *E.g.*, *Fesanco v. HHS*, 99 Fed. Cl. 28 (2011) (Judge Braden affirming); *Canuto v. HHS* (filed 4-18-16) (Judge Yock affirming).

In none of the rulings since the test cases has a special master or judge found any merit in an allegation that any vaccine can contribute to causing autism.[4]

### III

### PROCEDURAL HISTORY[5]

The Petitioners, Kellie Miller and Ron Miller, filed this petition on March 26, 2002, alleging that their minor daughter, A.H.M., was injured by several vaccinations. (Petition, ECF

---

[4] I am well aware, of course, that during the years since the "test cases" were decided, in two cases involving vaccinees suffering from ASDs, Vaccine Act compensation was granted. But in *neither* of those cases did the Respondent concede, nor did a special master find, that there was any *"causation-in-fact"* connection between a vaccination and the vaccinee's ASD. Instead, in both cases it was conceded or found that the vaccinee displayed the symptoms of a *Table Injury* within the Table time frame after vaccination. (See §300aa-11(c)(1)(C)(i); §300aa-14.)

In *Poling v. HHS*, the presiding special master clarified that the family was compensated because the Respondent conceded that the Poling child had suffered a *Table Injury--not* because the Respondent or the special master had concluded that any vaccination had contributed to causing or aggravating the child's ASD. *See Poling v. HHS*, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cir Spec. Mstr. Jan. 28, 2011) (a fees decision, but noting specifically that the case was compensated as a Table Injury).

Second, in *Wright v. HHS*, No. 12-423, 2015 WL 6665600 (Fed. Cl. Spec. Mstr. Sept. 21, 2015), Special Master Vowell concluded that a child, later diagnosed with ASD, suffered a "Table Injury" after a vaccination. However, she stressed that she was *not* finding that the vaccinee's ASD in that case was "caused-in-fact" by the vaccination--to the contrary, she specifically found that the evidence in that case did *not* support a "causation-in-fact" claim, going so far as to remark that the petitioners' "causation-in-fact" theory in that case was "absurd." *Wright v. HHS*, No. 12-423, 2015 WL 6665600, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).

The compensation of these two cases, thus, does *not* afford any support to the notion that vaccinations can contribute to the *causation* of autism. In setting up the Vaccine Act compensation system, Congress forthrightly acknowledged that the Table Injury presumptions would result in compensation for some injuries that were *not*, in fact, truly vaccine-caused. H.R. Rept. No. 99-908, 18, 1986 U.S.C.C.A.N. 6344, 6359. ("The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of a vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related.")

[5] A more detailed procedural history of this case was presented in Chief Special Master Vowell's Decision denying compensation in this case. *See* 2015 WL 5456093, at *1-6. Here I lay out only those details relevant to this Decision.

No. 1.) Because this case involved a child who suffered from an autism spectrum disorder (ASD), proceedings in the case, as explained in Section II of this Decision above, were stayed until the outcomes of the OAP "test cases" became final. On March 22, 2007, the case was assigned to Special Master Denise Vowell.

In April 2011, after the final appellate decision in the OAP test cases was issued, Petitioners were ordered to inform the special master whether they intended to proceed with their claim, either on a new theory of causation or with new evidence on one or both of the rejected causation theories. (Order, issued Apr. 29, 2011.) On July 18, 2011, Petitioners filed an amended petition, which claimed that the varicella vaccination received on June 4, 1999, was a causal vaccination, in addition to the vaccinations received on September 15, 1999. (ECF No. 27.)

However, Special Master Vowell found that the --

> filed medical records did not establish the diagnosis of a mitochondrial dysfunction claimed in the amended petition, and [an] affidavit of Dr. Amy Holmes, a treating physician, filed with the original petition in 2002 as Pet. Ex. 7, was inadequate to establish vaccine causation.

2015 WL 5456093, at *4. The special master expressed these views in an Order filed on July 28, 2011. (ECF No. 28.)

On December 1, 2011, Petitioners' attorney, Michael L. Cave, filed the expert report of his mother, Dr. Stephanie Cave, in support of Petitioners' causation claim. (ECF No. 34.) Special Master Vowell immediately expressed to Mr. Cave her doubts about Dr. Cave's report, filing an Order containing a lengthy list of "significant problems" with the report substantively, and ordered Mr. Cave to file a supplemental report of Dr. Cave, or the report of a different expert, curing the defects. (Order, issued Dec. 6, 2011, ECF No. 35.) In that same order, Special Master Vowell indicated concerns about the familial relationship between Dr. Cave and Mr. Cave, noting that such relationship could make payment of expert fees "problematic." (ECF No. 35, p. 2, fn. 3.)

Petitioners filed a supplemental report from Dr. Cave on January 23, 2012, and chose to keep Dr. Cave as their testifying expert in this case. Special Master Vowell noted that during the last four years before her Decision was filed, Petitioners --

> modified their claim repeatedly, raising new theories and re-litigating old ones, but *** failed to produce reliable evidence that any vaccine or combination of vaccines that A.H.M. received actually caused her condition.

2015 WL 5456093 at *1.

An evidentiary hearing was held on May 10, 2013, in which Dr. Cave was the sole expert for Petitioners, and Dr. Max Wiznitzer, a pediatric neurologist, testified for Respondent.

On August 18, 2015, Special Master Vowell filed her Decision denying Petitioners' claim for Program compensation. (ECF No. 79.) That decision will be discussed in detail in Section

IV of this Decision below.  Petitioners did not seek review of that Decision, so that judgement denying their claim was entered on September 18, 2015.  (ECF No. 83.)

Due to Special Master Vowell's imminent retirement, the case was reassigned to my docket on August 21, 2015.  (ECF No. 81.)

On March 7, 2016, Petitioners filed an application seeking attorneys' fees and costs incurred in their attempt to gain compensation in this proceeding.  (ECF No. 84.)  They seek a total of $63,668.82 in fees and costs.  Respondent filed a short Response on March 23, 2016, arguing generally that I should award a reduced amount, but offering no substantial analysis of the application.  (ECF No. 85.)  The Respondent takes the position that the Vaccine Act does not contemplate a "role for Respondent in the resolution of a request by a petitioner for an award of attorneys' fees and costs," (*id*., p. 1), and requests that the special master "exercise his discretion" in determining a reasonable award (*id*., p. 4).

## IV

## SPECIAL MASTER VOWELL'S DECISION

Special Master Vowell rejected the Petitioners' claim in a Decision filed on August 18, 2015.  Although the special master provided a lengthy discussion of why she denied the Petitioners' claim, I will highlight a few of her points here.

### A. *General deficiencies in Dr. Cave's qualifications and Petitioners' presentation*

Special Master Vowell found that, in general, Dr. Cave's and Mr. Cave's presentations were poorly developed and quite unpersuasive.  She summarized that --

> Petitioners' hearing presentation and post-hearing arguments were not well-developed or presented.  In spite of my cautions during several status conferences and in orders that I did not intend to permit re-litigation of the rejected OAP test case theories, absent new evidence, Dr. Cave presented testimony about mercury, oxidative stress, and brain inflammation that had been heard and rejected in the OAP test cases, without producing any new evidence.  The presentation of their new mitochondrial disorder theory was highly speculative, poorly explained by Dr. Cave, and did not fit the facts of petitioners' case.

2015 WL 5456093, at *7 (footnote omitted).  In her discussion, Special Master Vowell emphasized that --

> Dr. Wiznitzer's qualifications to opine on the causes of ASD and whether A.H.M. has ASD, or a mitochondrial dysfunction masquerading as ASD, far exceed those of Dr. Cave.  Doctor Wiznitzer is more highly credentialed in relevant areas such as pediatrics and neurology than Dr. Cave.

2015 WL 5456093, at *11.  The special master noted that while Dr. Cave is board-certified in family medicine, Dr. Cave was severely underqualified to testify in the *specialized* area concerning the causation of ASDs.  2015 WL 5456093, at *8.  Special Master Vowell stated that

9

> Despite her lack of training, research, or board certification in relevant disciplines, Dr. Cave opined on a range of medical conditions, but offered little support for her opinions, *** [and gave] sweeping statements about causation (*see, e.g.*, Tr. at 70-71) and opinions in areas in which she has neither the training nor the experience to opine credibly.

*Id.*, at *11. The special master summarized that Dr. Cave had "poor qualifications to opine as an expert" in this case. *Id*. at *12.

### B. Dr. Cave's and Mr. Cave's misreading and/or disregard of the medical records

One significant aspect of Special Master Vowell's reasoning in rejecting Petitioners' claim was that --

> after reviewing the entire record and weighing the experts' testimony, I conclude that the symptoms and behaviors that Dr. Cave relied upon for her conclusion that A.H.M. regressed did not occur as she described them.

2015 WL 5456093, at *24. For example, regarding Dr. Cave's assertion that A.H.M. experienced a "sudden" or "dramatic" reaction to either his June 1999 or September 1999 vaccinations, Special Master Vowell found that assertion to be incorrect. *Id*. at *25. She found that that statement by Dr. Cave was inconsistent with the contemporaneous medical records. *Id*. She also found that Dr. Cave's assertion that A.H.M. experienced a sharp increase in illnesses after the September vaccination was also inconsistent with the contemporaneous medical records. *Id*. The Special Master further found that Dr. Cave's testimony about A.H.M.'s language "demonstrated a lack of familiarity with and a selective reading of the information contained in A.H.M.'s records." *Id*. at *26. She also observed that "Doctor Cave's assertions about a developmental regression were based on a selective reading of the medical records." *Id*. at *27.

In short, Special Master Vowell criticized both Dr. Cave and Mr. Cave for basing their allegations of vaccine-caused injury upon a major distortion of the facts of A.H.M.'s case. She stated that "Petitioners' assertions regarding the factual predicate for their claims are so far removed from the facts of this case that I could deny petitioners' claims on that basis alone." 2015 WL 5456093, at *37.

### C. Dr. Cave's confused and incorrect testimony concerning an alleged "mitochondrial disorder"

One major difference between the opposing experts was whether A.H.M. suffered from a mitochondrial disorder, as Dr. Cave asserted. On this point, Special Master Vowell stated that "[n]o treating physician or specialist ever diagnosed A.H.M. with a mitochondrial disorder, mitochondrial disease, or mitochondrial dysfunction." 2015 WL 5456093 at *28. The special master engaged in a lengthy analysis of the "Morava Criteria" for identifying the existence of a mitochondrial disorder (*id*. at 30-34), and found that Dr. Cave's attempt to use those criteria "reflected a fundamental misunderstanding of the nature of the symptoms involved in mitochondrial disorders and how such disorders are diagnosed" (*id*. at *30). She added that Petitioners' presentation of their mitochondrial disorder theory "was highly speculative, poorly explained by Dr. Cave, and did not fit the facts of Petitioners' case." *Id*. at *7. The special

10

master found that Dr. Cave was clearly wrong in asserting that A.H.M. suffered from either a "mitochondrial disorder" or a "mitochondrial dysfunction." *Id*. at *34-36.

### D. The Petitioners' "Table Injury" claim

As Special Master Vowell pointed out in her Decision, there are two ways to establish entitlement to causation under the Vaccine Act -- either by demonstrating that the vaccinee suffered a "Table Injury," or by demonstrating that one or more vaccines "caused-in-fact" an injury to the vaccinee. 2015 WL 5456093, at *36. Less than one month before the hearing in this case, Petitioners for the first time raised a claim of "Table Injury encephalopathy," allegedly occurring after the vaccinations of September 1999. 2015 WL 5456093, at *7. After listening to their Table Injury claim at the evidentiary hearing, Special Master Vowell found the claim to be without merit. *Id*. at *37-39. She found the claim to be "poorly articulated." *Id*. at *37. The special master found --

> nothing in the record to indicate A.H.M. suffered any reaction to the DTaP and MMR vaccines she received on September 15, 1999, much less an encephalopathy as defined in the *** Vaccine Injury Table. Certainly, she did not suffer an acute encephalopathy within the time periods required by the Vaccine Injury Table. *See* 42 C.F.R. § 100.3(a)II.B and III.B.

*Id*. at *38.

Further, quite relevantly to this Decision's ruling concerning "reasonable basis," Special Master Vowell concluded not only that Petitioners' Table Injury claim was without merit, but added that -- "[u]nder the facts of this case, it was *unreasonable* to maintain that A.H.M. experienced a Table encephalopathy." *Id*. at *37 (emphasis added).

### E. Petitioners' "causation-in-fact" claims in general

I have already discussed above that Special Master Vowell found the "mitochondrial disorder" aspect of Petitioners' "causation-in-fact" claim to be wrong, and reflective of a "fundamental misunderstanding" of the science concerning that alleged disorder. 2015 WL 5456093, at *30. As to other aspect of Petitioners' two-pronged "causation-in-fact" theory in this case, Special Master Vowell again found Petitioners' claims to be completely unpersuasive. *Id*. at *39-43. The special master listed many defects in Dr. Cave's presentation. For example, Special Master Vowell observed that --

> Doctor Cave provided few details about and little support for her theory. The medical literature offered by Dr. Cave either did not indicate what she claimed or did not provide support for her theories. She referred to oxidative stress on several occasions but failed to explain how the vaccines A.H.M. received could have caused oxidative stress sufficient to result in the damage she describes. Identifying the "toxins" in the vaccines A.H.M. received, Dr. Cave listed monosodium glutamate and heavy metals such as aluminum and mercury but sometimes included other components as well as the live virus itself. *See, e.g.*, Pet. Ex. 11–a at 10–11. She offered no information regarding the quantities required for toxicity, the quantities present in the vaccines, or any reliable evidence that these

11

amounts could cause mitochondrial dysfunction, impair mitochondrial dysfunction or cause ASD to develop.

2015 WL 5456093, at *41 (footnote omitted). The special master also noted that during the evidentiary hearing, "Doctor Cave switched with abandon between *** variations of her theory." *Id*.

### F. Summary comments of Special Master Vowell

Special Master Vowell summarized that "Petitioners' hearing presentation and post-hearing arguments were not well-developed or presented." 2015 WL 5456093, at *7. The special master found the "content" of Dr. Cave's opinion and testimony to be "troubling." *Id*. at *12. She noted inconsistencies in Petitioners' presentation, noting, for example, that --

[p]recisely how petitioners squared their claim in the petition that A.H.M. suffered a progressive decrease in brain function with their claim that A.H.M. improved on treatment and now has fewer deficits was never elucidated.

*Id*. at *6.

The special master also noted with concern that at the evidentiary hearing Mr. Cave first stated that he had talked with Petitioner Kellie Miller on the night before the hearing, but later admitted that he had not been in contact with the Petitioners for some months before the hearing. 2015 WL 5456093, at *5.

Finally, Special Master Vowell also commented that Mr. Cave's election to utilize his mother as his sole expert witness at the evidentiary hearing reflected poorly on the "judgment" of Mr. Cave in presenting his clients' case. 2015 WL 5456093, at *12.

### V

### DETERMINATION CONCERNING "REASONABLE BASIS"

#### A. There was a reasonable basis <u>prior</u> to the decision to engage Dr. Cave as the testifying expert.

As set forth above in Section II of this Decision, in the early 2000s major controversies arose as to the question of whether autism spectrum disorders might be caused or otherwise affected by either MMR vaccines or thimerosal-containing vaccines. Therefore, thousands of parents filed Vaccine Act claims during the early 2000s alleging that their children's ASDs were vaccine-caused. I and other special masters have found that these claims were brought in good faith. Further, given the scientific uncertainty at the time, I find that the *filing* of this *particular* petition in 2002, along with thousands like it, was reasonable. It was further reasonable to keep such claims, including this one, pending until the OAP "test cases" became final in 2010, and for some period of time thereafter, in order for counsel to digest the complicated science, and to consult with qualified experts to see if a reasonable basis to go forward with the claims could be

found. Accordingly, I will compensate counsel in this case for his reasonable efforts in filing the petition, and for his efforts up until the time in 2011 that he chose an unqualified expert, his own mother, to become his expert witness.

**B. *There was no reasonable basis to pursue this case subsequent to the decision to engage Dr. Cave as the testifying expert.***

As demonstrated by the excerpts from Special Master Vowell's opinion cited above, that special master clearly was of the opinion that Petitioners' counsel and Dr. Cave presented an extremely defective case. After reviewing the record of this case myself, I agree with all of Special Master Vowell's comments. I have reviewed Dr. Cave's expert reports and other filings, Dr. Cave's testimony during the evidentiary hearing, and the many filings of Mr. Cave on Petitioners' behalf, including his post-hearing memorandum. I conclude, like Special Master Vowell, that Petitioners' and Dr. Cave's pre-hearing, hearing, and post-hearing arguments were extremely poorly developed and presented -- to the point of being, in essence, frivolous.

I agree with Special Master Vowell that Dr. Cave, certified in family medicine but without any special training or qualifications pertinent to the main issues in this case -- *i.e.*, whether a Table Injury encephalopathy took place, whether A.H.M. suffered from a mitochondrial disorder, or the causation of autism spectrum disorders -- was unqualified to present a persuasive opinion in this case. *E.g.*, 2015 WL 5456093, at *7, *11, *12.

I agree with Special Master Vowell that the presentations of both Dr. Cave and Mr. Cave were based upon a serious misreading and/or a disregard of the medical records pertaining to A.H.M. *E.g.*, 2015 WL 5456093, at *24-27, *37. For example, the medical records do not support Dr. Cave's assertion that A.H.M. suffered a "sudden" or "dramatic" reaction after either her June 1999 or September 1999 vaccinations. *Id*. at *25. As the Special Master summarized, "Petitioners' assertions regarding the factual predicate for their claims are *** far removed from the facts of this case." *Id*. at *37.

I also agree with Special Master Vowell that Dr. Cave's testimony about an alleged "mitochondrial disorder" in A.H.M. was confused and plainly incorrect. 2015 WL 5456093 at *28-36. As that special master concluded, Dr. Cave's testimony concerning that issue "reflected a fundamental misunderstanding of the nature of the symptoms involved in mitochondrial disorders and how such disorders are diagnosed." 2015 WL 5456093, at *30.

Further, I agree with Special Master Vowell that Mr. Cave's and Dr. Cave's argument that A.H.M. suffered a "Table Injury encephalopathy" was completely contradicted by the medical records, and completely devoid of merit. 2015 WL 5456093, at *37-39. The special master went so far as to remark that it was "unreasonable" for Mr. Cave and Dr. Cave to argue that A.H.M. experienced a Table Injury encephalopathy. *Id*. at *37.

I also agree with Special Master Vowell that, in addition to Dr. Cave's misguided "mitochondrial disorder" contention mentioned above, the other aspects of Petitioners' "causation-in-fact" theories were completely unpersuasive. 2015 WL 5456093, at *39-43.

Accordingly, in light of all the gross deficiencies in Petitioners' case described above, I come inevitably to the conclusion that there was *no reasonable basis* for Petitioners' counsel to

go forward with this extremely weak case, subsequent to his decision in 2011 to engage Dr. Cave as Petitioners' testifying expert. The only reasonable course for Petitioners' counsel at that time, given the facts in the medical record, and if the only expert that he could obtain was Dr. Cave, was either to persuade Petitioners to abandon their claim, or, failing that, to withdraw from the case. For Mr. Cave to incur the expense of Dr. Cave's defective reports, then to push this case forward to an evidentiary hearing on the basis of theories that were so unpersuasive, and so contrary to the actual medical records of A.H.M., was simply not reasonable.

Adding to the lack of reasonable basis in this case is that prior to 2011, when Mr. Cave solicited the report of Dr. Cave, there were *several strong indications*, of which Mr. Cave was aware, that he was retaining an underqualified and unpersuasive expert. For example, in *Nilson v. HHS*, No. 98-797V, 2005 WL 6122524 (Fed. Cl. Spec. Mstr. Aug. 31, 2005), Special Master Sweeney (now Judge Sweeney) compared the expert reports and testimony of Dr. Cave and Dr. Wiznitzer regarding several disputed issues, and found that Dr. Wiznitzer's opinion on each was more credible. *Id*. at *17-20. The special master concluded that "[i]n this case, Dr. Cave's theories of causation were effectively rebutted by a highly-credentialed pediatric neurologist, Dr. Wiznitzer, whose testimony was far more credible and compelling." *Id*. at *20. In *Berge v. HHS*, No. 08-223V, 2010 WL 3431601 (Fed. Cl. Spec. Mstr. Aug. 2, 2010), Special Master Vowell dismissed the case largely because of the fact that "Dr. Cave's expert report being premised upon information supplied by the parents, [without discussing] the medical records at all, that opinion is rejected as without factual predicate." *Id*. at *2 (citation omitted). Thus, in 2010 Dr. Cave was made aware of the necessity to substantiate her factual allegations in Vaccine Act cases by citing the medical records, but nevertheless, she failed to do so in this case. Thus, the *Nilson* and *Berge* opinions demonstrate that by 2011 Mr. Cave should have been aware that Dr. Cave was *not* a credible witness for this case.[6]

## VI

## NOTATION CONCERNING "REASONABLE BASIS" IN AUTISM CASES IN GENERAL

As discussed above in Section II of this Decision, in the early 2000s controversies arose concerning whether autism spectrum disorders might be caused or affected by vaccines. Thus, thousands of Vaccine Act claims were filed during those years alleging that ASDs were vaccine-caused. These claims were certainly brought in good faith. Further, in light of the scientific uncertainty at the time, I find that the *filing* of those petitions was reasonable. It was further reasonable to keep such claims pending until the OAP "test cases" became final in 2010, and for

---

[6] I also note that in *Mooney v. HHS*, No. 05-266V, 2014 WL 7715158 (Fed. Cl. Spec. Mstr. Dec. 29, 2014), Special Master Vowell declined to award costs for the production of Dr. Cave's expert opinion, awarding only a small amount for "consultation" services, and added that "I am unlikely to authorize Dr. Cave's consultant fees for hearing preparation in any similar cases filed by Mr. Cave." *Id*. at *14.

some period of time thereafter, in order for counsel for each petitioner to digest the complicated science, and to consult with experts to see if a reasonable basis to go forward could be found.

However, by the end of 2010, the two major theories of vaccine-causation of autism had been thoroughly considered and rejected in the OAP test cases, with opinions that, among other things, found that *all* of the many reputable epidemiological studies had found *no association* between any vaccines and autism. At that point, the vast majority of the approximately 5,000 autism petitioners elected either to withdraw their claims, or to request that the special master enter a decision denying their claim on the written record. Only a small minority of the autism petitioners elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses. Since 2010, a number of such cases have gone to trial before special masters, and in the cases of this type decided thus far, all have resulted in *rejection* of petitioners' claims that vaccines were the cause-in-fact of their children's ASDs. *See* the cases cited above in Section II.

There is now, therefore, a serious question concerning whether it is reasonable for additional Vaccine Act petitioners to continue to pursue highly speculative theories concerning vaccinees with autism spectrum disorders. In each such case, of course, a case-specific decision must be made concerning if and when it became unreasonable, under all the circumstances of the case, to continue to go forward. In many of the cases since 2010, as in this case, petitioners have tried to avoid the conclusions of the test cases by alleging that a child suffered a vaccine-caused "encephalopathy" that resulted in "autistic-like features," or that a child had an underlying "mitochondrial disorder" that somehow made the child more vulnerable to injuries by vaccines. But such cases, in essence, have amounted to attempts to prove that vaccines can cause or aggravate *symptoms of ASDs*. And, except for the two highly unusual Table Injury cases described at footnote 4 above, all such theories have been *rejected*.

Further, a review of the post-test case decisions enumerated in Section II above demonstrates that those cases typically involved expert witnesses who were quite underqualified to opine on the vaccine-causation issues at hand, and/or presented theories with no substantial scientific merit, and/or disregarded the facts contained in the medical records of the case.

Accordingly, I hereby put counsel, especially in autism-related cases, on notice, once again, that if counsel continue to go forward with such extremely weak cases, I am *not* likely to find that there was a reasonable basis for their continued prosecution of the case.

## VII

## CALCULATIONS OF FEES AND COSTS AWARDED

### 1. *Attorney's hourly rates*

Attorney Cave has practiced law since 1999. In this case, he seeks compensation at the hourly rates of $161 for attorney services performed in 2002; $165 for 2003; $169 for 2004; $175 for 2005; $181 for 2006; $186 for 2007; $193 for 2008; $248 for 2009; $253 for 2010; $261 for 2011; and higher amounts for 2012 to 2015. (ECF No. 84-2.) The rates for 2006 –

2011 are the same as or quite similar to the rates that Special Master Vowell granted to him for those years in the case of *Mooney v. HHS*, 2014 WL 7715158, at *9. I find those claimed rates to be reasonable. I will compensate Mr. Cave at his claimed rates from 2002 through 2011.

### 2. Attorney hours in general

I find reasonable the number of hours Mr. Cave billed for 2002 through 2010, for the reasons set forth above. As to the hours billed for 2011, I will compensate Mr. Cave for the hours billed from the beginning of that year through May 31, 2011. Based on Mr. Cave's billing records, however, it appears that about that time Mr. Cave solicited an expert report from Dr. Cave, which he "reviewed" on July 15, 2011. (ECF No. 84-4, p. 2.) I will not compensate Mr. Cave for the hours after May 31, 2011, for the reasons cited above -- *i.e.*, as explained, I find *no reasonable basis* for Mr. Cave to solicit an expert report from Dr. Cave, and I find *no reasonable basis* for the claim for Vaccine Act compensation that Mr. Cave and Dr. Cave put forward after that time.

### 3. Summary of attorney hours

Utilizing Mr. Cave's summary in his fees application (ECF No. 84-4, p. 9), I award him the fees requested for 2002 through 2010, which total $3,440.02. For 2011, I award him fees for the hours claimed through May 31, 2011. (3.66 hours times $261 per hour = $956.82.)

### 4. Costs

Of the costs claimed at ECF No. 84-4, p. 9, I allow only the $150 for the filing fee paid in 2002. I deny the other costs claimed on that page, as they were all incurred during 2012. (ECF No. 84-4, pp. 13-20.) I also deny all costs claimed at ECF No. 84-4, p. 10, consisting of $25,443 paid to Dr. Cave, plus the costs of the evidentiary hearing.

### 5. Summary

As explained above, I award Petitioners $150 in costs, $3,440.02 for Mr. Cave's services in 2002-2010, and $956.82 for Mr. Cave's services in January through May of 2011, for a total award of $4,546.84.

## VIII

## CONCLUSION

For the foregoing reasons, I award Petitioners $4,546.84 in attorneys' fees and costs. The $4,546.84 award shall be made in the form of a check payable jointly to Petitioners and Petitioners' counsel. The Clerk of this Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

/s/ George L. Hastings, Jr.
George L. Hastings, Jr.
Special Master
